2021 IL App (2d) 190132-U
No. 2-19-0132
Order filed March 26, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-2304 |
| DERRICK L. GIVENS, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence established that defendant knowingly possessed a firearm (and thus was an armed habitual criminal) where (1) a passenger in a vehicle driven by defendant as he fled from the police testified that he saw defendant reach into his jacket and throw an object out the window during the pursuit; (2) shortly after the crash, police found a handgun along the route of the pursuit; and (3) the passenger's criminal record was not a basis for rejecting his testimony.

¶ 2    In this appeal, defendant, Derrick L. Givens, contends that the evidence in support of his conviction of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)) was insufficient in that it failed to properly establish his *constructive* possession of a firearm that the

police found near where he crashed a car during a chase. We conclude that the evidence adequately established defendant's *actual* possession of the firearm. Accordingly, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4      A grand jury indicted defendant on eight counts relating to a December 9, 2017, traffic stop and defendant's ensuing flight from that stop. The State later nolle-prossed two of those counts, and defendant proceeded to a jury trial on the following six counts: armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)) (count I); armed violence (720 ILCS 5/33A-2(a) (West 2016)) predicated on unlawful possession of a substance containing heroin (720 ILCS 570/402(c) (West 2016)) (count III); armed violence (720 ILCS 5/33A-2(a) (West 2016)) predicated on aggravated fleeing or attempting to elude a law enforcement officer (625 ILCS 5/11-204.1(a)(l) (West 2016)) (count IV); unlawful possession, with intent to deliver, of one gram or more but less than 15 grams of a substance containing heroin (720 ILCS 570/401(c)(l) (West 2016)) (count V); and aggravated fleeing or attempting to elude a peace officer—in excess of 21 miles per hour over the posted speed limit (625 ILCS 5/11-204.l(a)(l) (West 2016)) (count VII); and unlawful possession of a substance containing heroin (720 ILCS 570/402(c) (West 2016)) (count VIII).

¶ 5      At trial, the parties stipulated to defendant's prior convictions of two forcible felonies.

¶ 6      The State's first witness, Detrick Walton, admitted that he had been convicted of felonies in Mississippi. He testified that, on December 9, 2017, he was one of two passengers in a car that was involved in a crash. At the time of the crash, he was carrying about a gram of marijuana, which the police learned of but for which they did not seek to prosecute him. He did not have any other contraband—drugs or firearms—with him in the car. He knew the driver by the name of "Derrick Givens," but could not identify defendant in court. He knew the other passenger only by the name "Rick," but he knew Rick better than Givens because he had cut Rick's hair. He was in

the car because he needed a ride from a hospital to a cousin's house. Rick was in the front passenger seat, and Walton was in the back passenger-side seat.

¶ 7    Walton testified that police officers pulled the car over for a traffic violation, but then the driver suddenly pulled away. As the car went around a corner, Walton saw the driver "fidgeting for something." The driver seemed to reach into the right side of his jacket with his left hand and then put his left hand out the window with something in that hand. Walton "couldn't make out what it was" at that point. After defendant put his hand out the window, Walton heard something hit the ground with a "bang." It was "just like a piece of steel hitting concrete." Under cross-examination, he explained what he had sensed as follows:

"Q. *** Now, after the car took off from the police, you said you saw the driver reaching into his jacket?

A. Yeah.

Q. And you motioned with your left arm?

A. Yes.

Q. And you said you saw him throw it out?

A. I seen him throw something out the window. I couldn't make it out what it was until it hit the ground. I know it wasn't no paper or nothing.

Q. So when it hit the ground, you knew what it was?

A. Yeah, common sense tell you that."

¶ 8    The car drove what Walton estimated to be a further 25 to 30 feet and then flipped so that it came to rest with the driver's side down. Walton, who was not wearing a seatbelt, slid over into the driver's side of the back seat.

¶ 9     Several investigators with the Aurora Police Department testified.  Investigator Colin Griffin testified that, at about 5:22 p.m. on December 9, 2017, he conducted a traffic stop for improper lane usage.  He activated the emergency lights in his "semi-marked" car.  The vehicle pulled over on Elmwood Drive just north of Indian Trail.

¶ 10    Griffin and his partner, Investigator Erik Swastek, approached the vehicle on opposite sides.  The driver's window was down, and, when Griffin looked through that window, he could see that there were three people in the car: the driver, a front-seat passenger, and another passenger behind the first.  He could smell marijuana in the car.  The driver, whom he recognized from "previous contacts," was defendant.  Defendant acknowledged to Griffin that he was still on "parole."  Defendant began to grasp the steering wheel tightly and look from side to side.  He also seemed to be hyperventilating.  Griffin, therefore, asked him to turn the car's engine off.  Defendant did nothing; Griffin again told him to turn the engine off.  Defendant then drove away, accelerating rapidly to a speed that greatly exceeded the speed limit for the residential street.

¶ 11    Griffin and Swastek returned to their vehicle, activated the siren, and pursued the car, which belonged to Derrick Gipson.  The squad car's dashboard camera was active.  Griffin did not notice anything coming from the car's windows during the pursuit.  The chase lasted about 30 seconds before the car struck a curb and flipped onto its side.  What appeared to be contraband drugs were found in several parts of the car, including a pill bottle with a "rock-like substance" found in the back seat.  Griffin gave defendant a ticket for driving with a suspended license.

¶ 12    The State played the recording made by the dashboard camera for the jury.  Griffin pointed out several frames in the video in which something was briefly visible in the street in "the area where the gun was recovered."  That recording was admitted into evidence.  On our own review of the video, we note that a small bright spot appears briefly at the side of the street in a place

consistent with Walton's testimony of something having been thrown from the car's driver's side window.

¶ 13    Investigator Gregory Christoffel testified that he was present when Swastek pried the windshield off the car to free defendant and the two passengers. Once a large part of the windshield was out, Christoffel could see defendant, whom he recognized, unbelted in the driver's seat and lying partly on the ground where the car had come to rest. When defendant left the car through the windshield opening, Christoffel immediately saw "a clear plastic bag with a rock-like substance laying [sic] in the grass, right where the driver's window was at."

¶ 14    Investigator Ronald McNeff testified that he went to the scene of a car crash in a residential area of Aurora in response to a dispatch. Following standard practice, he started searching backward along the car's route. He searched along that route for a few minutes before finding a firearm near the curb on the west side of the street. His partner, Investigator Brian Hammond, photographed the firearm where it lay before collecting it.

¶ 15    Hammond testified that the firearm he recovered was a semiautomatic handgun. It had 16 rounds in the magazine, but the chamber was empty. The gun was scratched on the side facing down. Hammond also photographed items recovered from the car, including a small digital scale found in the vicinity of the driver's seat.

¶ 16    The parties stipulated to testimony about the forensic testing of some recovered items. The substance in the bag that Christoffel found under defendant weighed 2.4 grams and tested positive for heroin. The gun was a "Smith and Wesson model SD9 VE .9 [sic] millimeter Lugar caliber semi-automatic pistol *** with attached laser light." The gun was swabbed for DNA and examined for latent fingerprints. Some partial prints were found and collected for possible comparison.

¶ 17    Katherine Sullivan, a forensic biologist employed by the Illinois State Police, testified that she performed a DNA analysis on the swabbings taken from the gun.  According to Sullivan "DNA types *** detected in [the first] sample were actually indicative of a mixture of DNA profiles from at least four different individuals."  "Those profiles were not able to be sorted into individual contributors," and "th[e] mixture [was] potentially incomplete and unsuitable for comparison to any known standards."  The second sample was similar: "the DNA types *** were indicative of a mixture of actually at least three people," and the "mixture was potentially incomplete and unsuitable for comparison to any standard."  Because no comparisons were possible, defendant could not be excluded as a contributor to either sample; the samples were too poor to allow any conclusions.  Similarly, a latent print examiner for the Aurora police testified that no latent prints were suitable for comparison.

¶ 18    Investigator Chris Converse, who had experience in narcotics investigations, testified that the 2.4 grams of heroin found in a bag near defendant appeared to be uncut and thus could have been repackaged into multiple doses for resale.  He also testified that drug dealers often use digital scales, such as the one recovered from the car, to divide drugs for resale.  Sandwich bags, which too were found in the car, also are associated with the repackaging of drugs for resale.  Converse testified that defendant was found to be carrying $530 in cash.  The front-seat passenger, Derrick Gipson, was carrying $230 in cash.  Converse explained that carrying cash is associated with drug transactions.

¶ 19    The State rested.  Defendant moved for a directed verdict, and the trial court denied the motion.

¶ 20    Defendant called Gipson as his first witness.  In December, 2017, Gipson was on probation in a gun-related case.  At about 5:30 p.m. on December 9, 2017, Gipson and defendant left a church

gymnasium in Gipson's gold Saturn car; defendant was driving because, according to Gipson, "he always drives." They picked another passenger up at Mercy Hospital; that person was going to give them a haircut. The police stopped the car at Indian Trail and Elmwood, but defendant drove away from the stop. At no time during the ensuing chase did Gipson see defendant reach into his jacket or make a motion out the window. He did not have a gun or drugs, and he did not see defendant with a gun or drugs.

¶ 21    Defendant called Investigator Swastek as his second and final witness. He stated that he and his partner "had set up *** covert surveillance on [a] vehicle"—Gipson's gold Saturn. They followed it for "less than ten minutes" before stopping it when the car's wheels crossed the center line. Swastek, who was on the passenger side of the squad car, got out and went to the passenger side of the Saturn. He tapped on the window—he could not remember whether it was the front or the back—and started talking to Gipson, whom he recognized. He did not recognize the back-seat passenger, and he could not see the driver's face. As he spoke to Gipson, he "detected an odor of burnt cannabis coming from [the interior of the car.]" The car suddenly sped away, and Swastek ran back to the squad car. Swastek agreed that, when he interviewed Walton, Walton said that he "knew the front passenger from a long time ago but didn't know the driver" (this was inconsistent, we note, with Walton's testimony that he knew the driver, though not as well as the second passenger). Swastek further agreed that defendant had $530 in cash on his person.

¶ 22    In its closing argument, the State noted to the jury that it had received instructions about both actual and constructive possession, but the State argued only that defendant had actual possession of the gun.

¶ 23    The jury found defendant guilty of counts I (armed habitual criminal), IV (armed violence predicated on aggravated fleeing or attempting to elude a peace officer) and VII (aggravated

fleeing or attempting to elude a peace officer). It found him not guilty of counts III (armed violence predicated on unlawful possession of a substance containing heroin), V (unlawful possession, with intent to deliver, of a substance containing heroin), and VII (unlawful possession of a substance containing heroin).

¶ 24    Defendant moved for a new trial or for judgments notwithstanding the verdict. He contended that (1) the evidence was insufficient to support the guilty verdicts and (2) that fleeing and eluding was not a proper predicate for the armed violence conviction. The court rejected the first contention but agreed with the second and thus vacated the conviction on count IV. The court imposed concurrent terms of 3 and 10 years' imprisonment on counts I (armed habitual criminal) and VII (aggravated fleeing or attempting to elude a peace officer), respectively. Defendant timely appealed.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, defendant contends that his conviction of being an armed habitual criminal must be reversed because the State failed to prove that he knowingly possessed a firearm. See 720 ILCS 5/24-1.7(a) (West 2016) ("A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of *** offenses [listed in the provision.]"). Defendant asserts without argument that he did not have actual possession of the gun that the police found on the side of the roadway. He does provide argument that he did not have *constructive* possession of the gun, but we agree with the State that defendant indeed had *actual* possession of the gun.

¶ 27    We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether,

after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Davison*, 233 Ill. 2d 30, 43 (2009). The following principles also govern our review:

"[R]eviewing courts apply [the standard of *Jackson* and *Collins*] regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. ***

[When the proof is based on circumstantial evidence, t]he trier of fact need not *** be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. Further, in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." (Emphasis in original. Internal quotation marks and citations omitted.) *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

"Under [the standard of *Jackson* and *Collins*], the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. But merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision. A conviction will be reversed where the evidence is so

unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of [the] defendant's guilt." (Citations omitted.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008). " '[T]he testimony of just one credible witness is sufficient for conviction.' " *People v. Swenson*, 2020 IL 124688, ¶ 36 (quoting *City of Chicago v. Morris*, 47 Ill. 2d 226, 230 (1970)).

¶ 28 Possession of contraband may be either actual or constructive. To show actual possession, the State must show that the contraband was "in the immediate and exclusive control of [the] defendant." *People v. Frieberg*, 147 Ill. 2d 326, 360 (1992). "Mere proximity is not sufficient evidence of actual possession." *People v. Schmalz*, 194 Ill. 2d 75, 81 (2000). Actual possession requires that the defendant exercise "present personal dominion" over the contraband; such possession exists when the defendant "exercises immediate and exclusive dominion or control" over the contraband. *Schmalz*, 194 Ill. 2d at 82. However, "[a]ctual possession does not require present personal touching of the illicit material but, rather, present personal dominion over it." *Schmalz*, 194 Ill. 2d at 82. The State may show actual possession through acts such as hiding or trying to dispose of the contraband. *E.g.*, *People v. Carodine*, 374 Ill. App. 3d 16, 25 (2007). In other words, an attempt to dispose of contraband is an act of control. Thus, although an attempt at disposal may end a defendant's direct contact with the contraband, such an act is itself an instance of the exercise of present personal dominion.

¶ 29 The State contends that Walton's testimony was sufficient to permit a rational jury to conclude that defendant removed the gun from his person and tossed it out the window, thereby exercising the present personal dominion necessary for *actual* possession of the gun. Defendant contends that the State failed to connect him to the gun found in the street:

> "There is no connection between [defendant] and weapons. There were two others
> in the vehicle with [an] incentive to get the gun out of the car[ ]as both were convicted

felons. There were ridge impressions lifted from the weapon but none that belong[ed] to the defendant. There was DNA tested off the gun but it did not belong to the Defendant. There was no admission to it's [*sic*] possession by [defendant]. No one saw a gun being thrown from the vehicle. The gun was found away from the vehicle in which three persons were found. In this case, the State presented three witnesses, none of whom saw a gun in the defendant's hands. The evidence merely shows that the gun was recovered after the crash that involved three individuals in the vehicle; any[ ]one of which [*sic*] could have thrown the gun from the car."

¶ 30    We agree with the State. Walton's testimony that the gun recovered by the police was thrown from the car was supported by the location and condition of the gun. Rejecting Walton's testimony would leave an implausible conclusion that it was sheer coincidence that a gun was found in the street in the area where Walton said the gun was thrown. Clearly, a rational jury could credit Walton's testimony.

¶ 31    We note that defendant misstates the forensic evidence. Neither the DNA nor the partial fingerprints recovered from the gun were suitable for comparison. Thus, it is incorrect to state that the forensic testing showed that neither the fingerprints nor the DNA were defendant's. Rather, the testimony was simply inconclusive.

¶ 32    The jury deemed Walton credible: the difference between the drug-related charges, which the jury rejected, and the gun-related charges, which it accepted, was Walton's testimony. The jury was entitled to make that determination. The jury decides the credibility of a witness's testimony; a reviewing court may not set aside a conviction based on a key witness's lack of credibility unless that testimony is "so lacking in credibility that a reasonable doubt of defendant's guilt remains." *People v. Schott*, 145 Ill. 2d 188, 206-07 (1991). Thus, in *Schott*, our supreme

court deemed the evidence to be insufficient when the key witness admitted that she "lies 'a lot' " and "her testimony was so fraught with inconsistencies and contradictions" that no rational person could find her credible. *Schott*, 145 Ill. 2d at 206-07.

¶ 33    Defendant implies that Walton was not credible because his felony record and the small amount of cannabis found on his person meant that he was under pressure to give testimony that favored the State. This is far from demonstrating that Walton was so unworthy of credit that no rational person could accept his testimony. Notably, had Walton in fact tried to favor the State, he almost certainly would have testified that he could see a gun in defendant's hand. Instead, Walton's testimony that he saw and heard things that led him to conclude that defendant had a gun suggests scrupulous care to distinguish inferences from observation. Walton was plainly not "so lacking in credibility that a reasonable doubt of defendant's guilt remain[ed]" (*Schott*, 145 Ill. 2d at 207).

¶ 34    Defendant suggests that Walton's testimony was insufficiently specific to exclude the possibility that the presence of the gun in the roadway was mere coincidence. As we noted, it is implausible that the gun would have been in a place that corresponded to Walton's testimony unless Walton had some source of knowledge about where the gun had fallen. In short, Walton's testimony was not inherently implausible nor was he otherwise discredited. A rational jury could believe him.

¶ 35    Defendant argues that, "[e]ven if the State could prove [that he] had knowledge of the presence of the weapon, [it] would be unable to prove [that he] exercised immediate and exclusive control over the area where the gun was found" and thus would be unable to show that he had constructive possession of the gun. But the requirement that the State must show immediate and exclusive control of an area in which the contraband was found is a requirement for establishing

*constructive* possession. See, *e.g.*, *People v Ross*, 2019 IL App (1st) 162341, ¶ 31. Possession of a prohibited item may be either actual *or* constructive. But, as we said above, the prosecution may show actual possession by demonstrating that the defendant has "exercise[d] immediate and exclusive dominion or control" over the contraband (*Schmalz*, 194 Ill. 2d at 82), such as by showing that the defendant tried to hide or dispose of the contraband (*e.g.*, *Carodine*, 374 Ill. App. 3d at 25). That is, an attempt to dispose of contraband is itself an act of control over that contraband. Thus, although an attempt at disposal may end a defendant's direct contact with the contraband, such an act is nevertheless an instance of the exercise of present personal dominion. Evidence sufficient to show that defendant threw the gun out the window is thus evidence sufficient to show his actual possession of the gun.

¶ 36 Defendant cites *People v. Spencer*, 2012 IL App (1st) 102094, in support of his claim that, "[s]ince [he] did not have actual physical possession of a weapon at the time of the incident, the State must prove constructive possession. *Spencer* notes, "When a defendant is not found in actual possession, the State must prove constructive possession" (*Spencer*, 2012 IL App (1st) 102094, ¶ 17). The statement in *Spencer* is correct, but it does not aid defendant, because the evidence was sufficient to support a conviction based on actual possession.

¶ 37                                    III. CONCLUSION

¶ 38 For the reasons stated, we conclude that the evidence that defendant was in actual possession of the handgun was sufficient to sustain his conviction of being an armed habitual criminal, and we, therefore, affirm that conviction.

¶ 39 Affirmed.